**COLONIAL REALTY CORPORATION,**
Plaintiff,

v.

**BRUNSWICK CORPORATION et al.,**
Defendants.

No. 64 Civ. 110.

United States District Court,
S. D. New York.

Aug. 31, 1971.

Spear & Hill, New York City, for plaintiff; Bruce Jay Colan, Thomas W. Hill, Jr., New York City, of counsel.

White & Case, New York City, for defendant Brunswick Corp. and individual defendants; Thomas Kiernan, Thomas McGanney, New York City, Mayer, Brown & Platt, by Leo Herzel, Chicago, Ill., of counsel.

Sullivan & Cromwell, New York City, for defendants Lehman Bros., Bache & Co., Loeb, Rhoades & Co. and Goldman, Sachs & Co.; William E. Willis, John F. Cannon, New York City, of counsel.

Whalen, O'Neill & Pillon, New York City, for defendant Arthur Andersen & Co. Charles G. Pillon, New York City, Wilson & McIlvaine, by Charles W. Boand, Chicago, Ill., of counsel.

PALMIERI, District Judge.

### PRELIMINARY STATEMENT

This is an action by a corporation for damages allegedly sustained as a result of material misrepresentations in a prospectus and omissions to state material facts required to be stated therein or necessary to make statements therein not misleading in violation of various sections of the federal securities laws. Defendants include Brunswick Corporation, several officers and directors of Brunswick, brokerage firms connected with the underwriting and distribution

of Brunswick's convertible debentures, and Arther Andersen & Co., the accounting firm named in Brunswick's registration statement.

Liability is predicated on § 12(2) and § 17(a) (1) (2) and (3) of the Securities Act of 1933 (15 U.S.C. §§ 77*l*(2) and 77q(a) (1), (2), (3) respectively) and §§ 9, 10(b) (and Rule 10b–5, 17 C.F.R. § 240.10b–5 thereunder), 15(c) (1), 18 and 29(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78i, 78j(b), 78*o*(c) (1), 78r and 78cc(b), respectively. The case was tried by the court without a jury and only two witnesses appeared at trial—Mr. James F. Urbanek, a vice president of Brunswick Corporation, and Mr. John Raben, an attorney and a partner of Sullivan & Cromwell, who participated in the preparation of the registration statement. Both witnesses were called by the plaintiff. Both were credible and articulate witnesses. Their testimony did not substantiate the plaintiff's case, nor did the depositions and documentary evidence.

The complaint challenges a prospectus and registration statement which became effective January 11, 1961, under the Securities Act of 1933. The registration statement covered the offer and sale by Brunswick of $25,634,400 of convertible subordinated debentures and the common stock issuable upon conversion thereof. The principal defect alleged by plaintiff is that the prospectus, instead of treating a financing agreement with C.I.T. Corporation as a long term debt and revealing the interest charges being paid thereon, treated the C.I.T. debt as a current liability and did not reveal the relevant interest charges and the fact that the rate of interest on the C.I.T. debt was substantially greater than the interest rate being paid for similar credit by Brunswick's major competitor. Plaintiff also alleges that the prospectus was defective and misleading in its use of the accrual method of accounting for installment sales of pinsetters; in the inadequacy of its reserves for bad debts;

and in its failure to note the impending saturation of the market for pinsetters.

Defendants answer that the prospectus was issued in full compliance with the rules and regulations of the Securities and Exchange Commission and that it was in no way defective or materially misleading.

The facts, insofar as they are relevant, are these: Plaintiff is a closely owned Delaware corporation engaged in the real estate business which holds, buys and sells securities. Defendant Brunswick was, at the time of the commencement of this action, one of the two leading manufacturers and distributors of bowling equipment. On January 11, 1961, a Registration Statement filed with the S.E.C. by Brunswick on December 5, 1960, and amended on January 6 and 11, 1961, was declared effective with respect to an issue of convertible debentures and the common stock issuable upon the conversion thereof. On that date plaintiff was the owner of approximately 4,900 shares of Brunswick common stock. As a Brunswick shareholder, plaintiff was entitled to subscribe to the debentures and received a copy of the prospectus. Plaintiff did not exercise its rights as to the offered stock, but between January 31, 1961, and January 4, 1962, it wrote and sold puts endorsed by Bache & Co., one of the defendants herein, on at least 31,600 shares of Brunswick common stock. Between May 22, 1961, and August 26, 1962, most of these puts were exercised by the holders thereof and plaintiff was required to purchase and did purchase 31,600 shares of Brunswick common stock at an aggregate cost, less commissions and premiums, of $1,691,667.56. Between June 8 and June 21, 1962, plaintiff sold 12,300 of the 31,600 shares for an aggregate price, minus commissions, of $302,823.-85. Plaintiff alleges that at the date prior to the commencement of this action the aggregate market value of the remaining 19,300 shares plaintiff held was $217,125, or $11.25 a share. This,

**550**

plaintiff claims, results in an aggregate loss of $1,171,718.[1]

The financing agreement which is central to this case was entered into in 1957 by the Brunswick-Murray Automatic Pinsetter Corporation (Pinsetter), a wholly owned subsidiary of Brunswick, and C.I.T. Finance Co. This agreement which was guaranteed by Brunswick provided that Pinsetter would assign to C.I.T. not less than 80% of all installment obligations arising out of the sale of pinsetter equipment and borrow not less than 70% of the face value of the paper so assigned. The agreement provided that Pinsetter would pay C.I.T. interest at an annual rate 6½% over and above the prime lending rate of New York banks in effect as of May 2 of each year during the life of the agreement.

The essence of plaintiff's argument is that this high interest rate and the details of the financing agreement should have been disclosed in the prospectus. Plaintiff does not, however, deny that the agreement was disclosed in Form 8–K filed by Brunswick with the S.E.C. and the New York Stock Exchange in June, 1957, and that the details of the agreement and the interest rate in question was reported by numerous business publications received by plaintiff prior to January 11, 1961.

On August 10, 1966, Judge Edelstein of this court granted defendants' motion for summary judgment on Count One of plaintiff's complaint based on § 11 of the Securities Act of 1933 (15 U.S.C. § 77k) on the ground that plaintiff was not a purchaser within the purview of § 11. Colonial Realty Corporation v. Brunswick Corp., 257 F.Supp. 875 (S.D. N.Y.1966). The other issues presented in the litigation were not resolved.

■ Essential to recovery under any of the above-mentioned statutory provisions is a determination that there was contained in this prospectus an untrue statement of material fact or an omission of material facts required to be stated therein or necessary to make statements therein not misleading.[2] Ad-

---

1. It is defendants' contention that by May of this year (1971) the price of the stock had risen to $30 a share, reducing or wiping out plaintiff's damages. (See Finding of Fact No. 18). Plaintiff argues that the price of the stock is frozen by the commencement of this lawsuit. Under the holding herein, it is unnecessary to decide that issue.

2. The relevant sections provide:
*1933 Act*
§ 12 Any person who

. . . . .

(2) offers or sells a security . . by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statement . . . not misleading . . . shall be liable. . .

§ 17(a) It shall be unlawful for any person in the offer or sale of any securities

. . . . .

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading.

*1934 Act*

Rule 10b–5: It shall be unlawful

. . . .

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . .

§ 9: In relevant part this section makes it unlawful for a dealer, broker, or other person selling or offering for sale or purchasing or offering to purchase a security registered on a national securities exchange, to induce such purchase or sale by making a material misrepresentation which he knew or had reason to know was false or misleading.

§ 15(c) (1): Prohibits brokers from using the mails or interstate commerce to effect a transaction in or induce a purchase or sale of any security otherwise than on a national securities exchange by means of any "manipulative, deceptive, or other fraudulent device or contrivance . . ."

§ 18: Imposes liability for damages upon any persons making or causing to be made materially false or misleading statements in documents filed with a national securities exchange.

ditionally, § 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder, upon which plaintiff primarily relies, requires findings of reliance, scienter, and causation. See generally, Bromberg, Securities Law, Vol. II, 8.3–8.6 (1970). It is not possible to make these findings in the case at bar.

The parties do not dispute that defendants fully complied with S.E.C. regulations in the preparation of the prospectus and registration statement. Such compliance creates a strong presumption of regularity:

> [W]hen nothing material is held back from the [S.E.C.] and the Commission itself considers that a certain matter need not be disclosed, it does not seem likely that a court in an action under § 11 or § 12(2) will "out Herod Herod" and impose liability for the omission. Loss, Securities Regulation, Vol. III, p. 1691 (2d edition).

■■ The test of materiality in this circuit has long been "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), cert. denied 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Accord, Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1971). The operational expenses of a company—e. g., hourly labor rates, prices of materials and supplies, and other costs of doing business—have not been generally considered items meriting special consideration in a prospectus. This situation is analogous.

■ Moreover, the requirement of reliance has been constantly reiterated in this circuit to maintain an action under Rule 10b–5. List v. Fashion Park, *supra*. A claim of reliance cannot be maintained in a case such as this where there is a great deal of evidence indicating that plaintiff knew or should have known of the interest rate in question. Pursuant to the requirements of the Securities Exchange Act, the C.I.T. financing agreement was disclosed in a Form 8–K report filed by Brunswick with the S.E.C. and the New York Stock Exchange in June, 1957. The prospectus clearly referred to the financing agreement in no less that five places, explaining that it had been filed as part of the registration statement and could be obtained from the S.E.C. The agreement was also reported in numerous financial publications. The precise interest rate in question was mentioned in Fortune, November 1959; Barron's, April 28, 1958; and a Loeb, Rhoades Report on Brunswick in October, 1960. This last report was sent by Loeb, Rhoades to plaintiff. Under these circumstances plaintiff cannot claim ignorance of a matter of public record and common knowledge.

Any claim of reliance is also dissipated by plaintiff's long history of transactions in the stock in question. The evidence amply proves that plaintiff had been writing puts on Brunswick stock long before he saw the prospectus on which he claims to have relied.

■ Finally, plaintiff has failed to prove scienter on the part of any of the defendants herein, whether this is to be interpreted as "actual knowledge of falsity," Heit v. Weitzen, 402 F.2d 909, 914 (2d Cir. 1968) cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), or "recklessness equivalent to wilful fraud," S.E.C. v. Texas Gulf Sulphur, 401 F.2d 833, 888 (2d Cir. 1968), cert. denied, Coates v. S.E.C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The testimony at trial, particularly that of James F. Urbanek, a vice president of Brunswick and former officer of Arthur Andersen & Co., the accounting firm involved in the preparation of the prospectus, demonstrates that the accounting judgments here disputed were made in good faith and based on generally accepted accounting principles.

■ Crucial to plaintiff's failure of proof in this case is the absence from trial of Milton E. Selig, the secretary-treasurer and 97% stock owner of plaintiff, Colonial Realty. In spite of the

court's admonition that Selig's testimony would be vital on the subject of reliance and materiality and that Selig's credibility would be very much in issue, Selig refused to appear, and plaintiff attempted to have his deposition introduced into evidence. In so doing, plaintiff relied on Rule 32(a) (3) (B), F.R. Civ.P., which provides:

> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>
> . . . . . .
>
> (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing. . . .

Plaintiff has cited authority for the literal application of this rule whether or not the absent party or witness offers an adequate excuse for his absence. Richmond v. Brooks, 227 F.2d 490 (2d Cir. 1955); Klepal v. Pennsylvania Railroad Co., 229 F.2d 610, 612 (2d Cir. 1956); Houser v. Snap-On Tools Corp., 202 F. Supp. 181 (D.Md.1962). (But note the court's comment at 202 F.Supp. 189 that "this proposition is less certain where the deposing officers are deemed to be the party itself.") The inappropriateness of such an application is readily apparent in a case such as this where a party (and as a 97% stockholder Selig can hardly be considered anything else) institutes a million dollar lawsuit in this court and then seeks to label himself a witness and avail himself of the 100 mile rule thereby avoiding first hand scrutiny of his story and credibility by the court. But it is not necessary to apply such a rule here as plaintiff has not convincingly demonstrated that Selig is in fact without a 100 mile distance of this courthouse. Using the shortest route between Selig's home in Bala Cynwyd, Pennsylvania, and the courthouse, i. e., the Pennsylvania Railroad to Newark, N. J., and the Hudson Tubes to the vicinity of the court, the plaintiff is indeed within 100 miles. The method of using the shortest railroad route to measure distance is that which is employed by the Commissioner of Juries in calculating mileage for the payment of jury fees.

Thus, having failed to prove the elements of materiality, reliance, or scienter, plaintiff has failed to prove a case for recovery under Rule 10b–5. Since the other sections relied upon require one or more of these elements to be proved, plaintiff has failed to prove a case under any theory.

■ Nor can any credence be given to plaintiff's other claims. In spite of lengthy examination at trial, Mr. Urbanek failed to testify that the accrual method of accounting was improper; on the contrary, he repeatedly testified that the accrual method was the most commonly employed accounting procedure where sales were to customers in the normal course of business and the proceeds were determined to be reasonably collectible; plaintiff was unable to produce any expert testimony to the contrary. Any claim by plaintiff of deceit through the use of the accrual method borders on the incredible in view of the clear statement in the prospectus that "profits on instalment sales are taken into income in the period in which the sales are recorded." (Prospectus at p. 34)

■■ Plaintiff has likewise failed to prove that Brunswick's reserves for bad debts were inadequate. "The amount of such reserve is a matter of accounting judgment. The evidence does not convince me that the accountant's judgment here was so clearly wrong that the balance sheet can be found to be false or misleading for lack of a higher reserve." Escott v. Barchris Construction Corp., 283 F.Supp. 643, 666 (S.D.N.Y.1968).

■ Finally, the claim that the prospectus should have predicted the saturation of the bowling market is unsupported in fact or law. Plaintiff has not offered evidence to support the saturation argument, and moreover, even if such saturation had been proved, such hindsight predictions do not belong in prospectuses and might even result in liability for violation of S.E.C. regula-

tions. Under no construction of the securities laws "is an insider obligated to confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his educated guess or predictions." SEC v. Texas Gulf Sulphur, *supra,* 401 F.2d at 848.

Defendants have claimed that plaintiff is a put and call dealer not registered as required by the securities laws and thus not entitled to recovery herein. Plaintiff's extensive dealings in securities lends some weight to such an assertion, but under the rulings made herein, it is unnecessary to decide that claim. Nor is it necessary to deal with the defenses of statute of frauds, collateral estoppel, or laches. Having found no merit to plaintiff's substantive claim, we need not reach collateral issues.

For these reasons judgment is awarded to defendants in this action.

 Defendants have moved pursuant to § 11(e) of the 1933 Act and §§ 9(e) and 18(a) of the Exchange Act (15 U.S.C. § 77k(e) and 15 U.S.C. §§ 78i(e) and 78r(a), respectively) for costs, including reasonable attorney's fees to Arthur Andersen in the aggregate amount of $147,874.25, and to Brunswick and its individual defendants in the aggregate amount of $520,758.59. Section 11(e) of the 1933 Act provides:

> In any suit under this . . . section . . . the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant . . . if the court believes the suit or the defense to have been without merit. . . .

Recoveries under this section have been rare, courts holding that the term "without merit" "implies a defense [or claim] bordering on frivolity." Can-Am Pe-

troleum Company v. Beck, 331 F.2d 371 (10th Cir., 1964); *accord,* Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1969), rev'd on other grounds, 422 F.2d 1124 (4th Cir. 1970). In Katz v. Delka Research Corp., 295 F. Supp. 647 (S.D.N.Y.1968), aff'd in part, rev'd in part, Katz v. Amos Treat & Co., 411 F.2d 1046 (2d Cir. 1969) the court found that plaintiff's case consisted of "nothing but vague assertions and conclusions" and that "he was unable to show any evidence whatever" and granted a directed verdict on the ground that plaintiff had failed to establish a *prima facie* case. However, even under these circumstances, the court said (at 649): "[A]lthough we held plaintiff's evidence insufficient, we cannot say that the action was entirely frivolous." The motion for counsel fees was thus denied.

Although the Exchange Act sets forth no specific requirement of bad faith,[3] it has been construed to include such a requirement. In Acker v. Schulte, 74 F.Supp. 683 (S.D.N.Y.1947), the court quoted the report of the Senate Committee on Banking and Currency:

> In order to give protection against "strike" suits or litigation brought in bad faith, the court is authorized to assess reasonable costs, including attorneys' fees, against either party to the suit, and even to require in advance an undertaking for the payment of such costs. Senate Committee on Banking and Currency, Senate Report 792, 73rd Congress, 2nd Session, p. 18.

Therefore, although judgment is granted to defendants, their motion for attorneys' fees is denied. The findings of fact and conclusions of law set forth below are intended to amplify and supplement what is set forth above.

## FINDINGS OF FACT

1. Plaintiff is a Delaware corporation having its principal office first in Philadelphia and subsequently in Bala

---

3. § 9(e) In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such

suit, and assess reasonable costs, including reasonable attorneys' fees.
(Securities Exchange Act of 1934)

Cynwyd, Pennsylvania. At the time this action had commenced plaintiff had outstanding 32,125.5 shares of common stock, of which Milton E. Selig owned 30,513.38, or 97%.

2. Defendant Brunswick is, and at all relevant times was, a Delaware corporation. It has its general office in Chicago and transacts business in New York City. It has been one of the nation's two leading manufacturers of bowling products.

3. Defendant Arthur Andersen & Co. is, and at all relevant times was, a partnership of certified public accountants having offices in a number of cities, including Chicago and New York. Andersen participated in the preparation of the registration statement of Brunswick which is the basis of this litigation.

4. Defendants Lehman Brothers, Goldman, Sachs & Co., Bache & Co. and Carl M. Loeb, Rhoades & Co. were each partnerships at the time of the commencement of this action and also registered brokers and dealers in securities. Each of them carried on business in New York City. Each of them was an underwriter of the offering of Brunswick considered *infra*.

5. On January 11, 1961, the Securities and Exchange Commission declared effective under the Securities Act of 1933, 15 U.S.C. § 77a et seq., a registration statement filed with the Securities and Exchange Commission by Brunswick on December 5, 1960, and amended on January 6 and January 11, 1961.

6. The registration statement covered the offer and sale by Brunswick of the following securities: (a) $25,634,400 principal amount of 4½% convertible subordinated debentures due January 1, 1981; (b) subscription warrants evidencing rights to subscribe to the debentures; and (c) such indeterminate shares of Brunswick common stock, no par value, as might be issued upon conversion of the debentures.

7. On January 11, 1961, each of the following persons (individual defendants) was either a director or principal officer, or both, of Brunswick, and each of such persons, unless otherwise noted, signed the registration statement as originally filed with the Securities and Exchange Commission and each amendment thereto:

| Name | Position |
| --- | --- |
| B. E. Bensinger | President, Principal Executive Officer and Director [a] |
| R. F. Bensinger | Chairman of the Board and Director |
| S. E. Meyers | Executive Vice-President and Director |
| H. F. Baer | Vice-President and Director |
| H. P. Cowen | Vice-President and Director |
| S. P. Jacobson | Vice-President and Director |
| L. H. Swanlund | Vice-President and Director |
| E. A. Stephan | General Counsel and Director |
| E. Gudeman | Director |
| W. M. Heymann | Director [b] |
| J. T. Rettaliata | Director [b] |
| J. G. Sevcik | Director [b] |
| R. E. Straus | Director [b] |
| H. J. Szold | Director |
| H. A. Wright (now deceased) | Director [b] |
| A. R. Cahill | Vice-President and Principal Financial Officer |
| R. V. Searson | Vice-President, Controller and Principal Accounting Officer |
| F. E. Troy | Vice-President [c] |

a. In addition to signing the registration statement on his own behalf, B. E. Bensinger signed the registration statement as originally filed with the Securities and Exchange Commission on behalf of Brunswick.

b. Each of these directors did not sign the registration statement.

c. F. E. Troy did not sign the registration statement on his own behalf, but signed each amendment thereto on behalf of Brunswick.

8. On January 11, 1961, individual defendants H. J. Szold and E. Gudeman, directors of Brunswick, were partners in Lehman Brothers.

9. Brunswick's prospectus dated January 11, 1961, formed Part I of the registration statement and was mailed to shareholders of Brunswick.

10. Following the development of the automatic pinsetter by Brunswick's competitor American Machine and Foundry Company in 1951, Brunswick introduced its own automatic pinsetter in 1956. In 1954 Brunswick entered into association with the Murray Corporation of America for the purpose of developing the Brunswick pinsetter. The Brunswick-Murray

Automatic Pinsetter Corporation was founded for that purpose. In May 1957, Brunswick and Murray decided to end their relationship, with Brunswick buying out Murray's interest. The need to finance this transaction instigated the Brunswick-C.I.T. Corporation financing agreement *infra*.

11. On or about May 2, 1957, the Brunswick-Murray Automatic Pinsetter Corporation entered into a financing agreement with C.I.T. Corporation, the performance of which was guaranteed by Brunswick in a related guaranty agreement. The financing agreement provided:

(a) Brunswick would assign to C.I.T. not less than 80% of all installment obligations created by Brunswick's sale of automatic pinsetters and borrow not less than 70% nor more than 90% of the face value of the obligations so assigned.

(b) Brunswick would pay the interest on the unpaid balance of such borrowings made during the first year at the rate of 10½% and on borrowings made each subsequent year at the rate of 10½% plus or minus the difference between the New York prime bank rate and 4% on May 2 of each subsequent year.

(c) The financing agreement was due to expire May 2, 1962, but Brunswick's obligations and indebtedness under the agreement would not expire until all receivables assigned to C.I.T. were paid.

12. Brunswick's indebtedness to C.I.T. pursuant to the financing agreement was classified as "current" in the consolidated financial statements contained in the prospectus. The prospectus omitted to state the interest rate payable by Brunswick to C.I.T. on the average daily unpaid principal balance of its indebtedness but did, in five places, refer to the indebtedness and the C.I.T.-Brunswick agreement, pointing out that the agreement was on file with and could be obtained from the Securities and Exchange Commission and the New York Stock Exchange.

13. Pursuant to the provisions of the Securities Act of 1933, the C.I.T. financing agreement was disclosed to the public in Form 8–K filed by Brunswick with the Securities and Exchange Commission and the New York Stock Exchange in June, 1957. From the date of its filing anyone with an interest in the agreement could have learned of its terms from his broker or could have obtained the entire agreement from the Securities and Exchange Commission or the New York Stock Exchange. The agreement was also discussed in numerous publications which ran articles about Brunswick prior to January 11, 1961. The precise interest rate under the agreement was mentioned in Fortune, November 1959; Barron's, April 28, 1958; and a Loeb, Rhoades Report on Brunswick in October 1960. The latter was sent to and received by plaintiff.

14. Brunswick elected to report its income from the sale of automatic pinsetters on the accrual basis. This meant that the full sales price and profit was reported at the time of sale. This was a matter of public record and was clearly noted in the prospectus.

15. On January 11, 1961, plaintiff owned 4,912 shares of Brunswick common stock. Prior to the effective date of the registration statement on which plaintiff relies, it had been actively selling puts and calls on Brunswick stock. The record shows transactions by plaintiff in Brunswick stock going back to at least 1957.

16. Between January 31, 1961, and January 4, 1962, plaintiff wrote and sold through various put and call brokers put options covering at least 31,600 shares of Brunswick common stock. Each put constituted a contract whereby plaintiff bound itself for a stated period of time to purchase at the option of the holder of the put a stated number of shares of Brunswick common stock at a stated price. Between May 22, 1961, and August 26, 1962, most of the puts written

by plaintiff were exercised by the holders thereof, and plaintiff purchased 31,-600 shares of Brunswick common stock at an aggregate cost to plaintiff of $1,-691,667.56.

17. Between June 8, 1962, and June 21, 1962, plaintiff sold through Bache 12,300 of these 31,600 shares of Brunswick common stock. The aggregate amount received by plaintiff in connection with such sales, less commissions, was $302,823.85.

18. At the time of the commencement of the action the market value of Brunswick common stock was $11.25 per share. The aggregate value of plaintiff's remaining stock was $217,125. On May 5, 1971, however, Brunswick stock had risen to close to $30 per share.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and of the parties to this action. Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v(a); Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa).

2. Both parties to this lawsuit have urged collateral estoppel claims on this court, plaintiff arguing that Judge Edelstein's opinion in Colonial Realty Corp. v. Brunswick Corp., 257 F.Supp. 875 (S.D.N.Y.1966) is dispositive; defendants arguing that Prince v. Bensinger, 244 A.2d 89 (Ct. of Chancery, Delaware 1968) controls. This court does not find sufficient support for either claim.

In Colonial Realty Corp. v. Brunswick Corp., *supra*, Judge Edelstein ruled that an open market buyer which did not acquire any of the stock issued pursuant to the registration statement could not recover for losses in the market value of other stock of the same class as the issued stock pursuant to § 11 of the 1933 Act. Any language in the case regarding material misrepresentations was dictum. The issues presented here were not before the court at that time. Thus, the principle of collateral estoppel does not apply.

Similarly, in Prince v. Bensinger, *supra*, the only issue before the court was judicial approval of a settlement of a stockholder's derivative suit. Although the court noted plaintiff's claims with respect to the alleged distortion of Brunswick's income through use of the accrual method and insufficient reserve for bad debts, it attributed no validity to them. It stated (at p. 93):

> The Court's responsibility at this juncture is to determine whether or not the proposed settlement terms are fair, reasonable and adequate, a settlement hearing not being in any sense a rehearsal of a trial . . . In other words, the question now for decision is whether or not the terms of the settlement are fair and reasonable when weighed against the probability of recovery at trial on the asserted claims . . . In making this evaluation, the function of the Court is merely to determine such probability and to go no further.

It follows that the issues here cannot be disposed of on the basis of collateral estoppel.

3. The Brunswick registration statement was filed in good faith and in conformity with all applicable rules and regulations of the Securities and Exchange Commission. The disclosure of the interest rate paid to C.I.T. was not required by the applicable S.E.C. form (Form S–1, Exhibit 60) nor was its disclosure necessary to make any other statements in the registration statement or prospectus not misleading. Disclosure of the interest rate is not a material fact required to be included under the holdings in List v. Fashion Park, *supra*.

4. The use of the accrual method to account for the installment sales of automatic pinsetters was adopted in good faith, and such treatment was in accord with generally accepted accounting principles. There was nothing improper, misleading, or deceptive in this treatment within the purview of § 12(2) and § 17(a) (1), (2), (3) of the Securities Act of 1933 and §§ 9, 10(b) (and Rule 10b–5 thereunder), 15(c) (1), 18, and

29(b) of the Securities Exchange Act of 1934.

5. The reserves for bad debts assigned by Brunswick were reasonable and adequate and allocated in good faith. There is no evidence that the accounting judgment utilized in allocating the reserves was clearly wrong or misleading. See Escott v. Barchris Construction Corp., 283 F.Supp. 643, 666 (S.D.N.Y. 1968).

6. Defendants committed no violation of the securities laws in their failure to speculate as to the possible impending saturation of the pinsetter market. Such a prediction would have been a prophecy rather than a fact and was not required to be stated in the prospectus. Moreover, the prospectus clearly described the waning market for pinsetters, noting (at p. 10) that "with the exception of a limited market of existing lanes suitable for, but not equipped with pinsetters, the Company believes the market for pinsetters consists of installations in new lanes and replacements."

7. There is no evidence that plaintiff or its 97% stockholder, Milton Selig, relied on the prospectus. The evidence clearly shows that the interest rate and details of the financing agreement were widely reported in financial publications and under such circumstances plaintiff cannot claim ignorance in this case. Moreover, plaintiff's long history of transactions in Brunswick stock further negates a claim of reliance on the prospectus in question. Reliance is a requirement under Rule 10b–5. See List v. Fashion Park, *supra*.

8. Plaintiff has failed to prove scienter on the part of any of the defendants, whether this is to be interpreted as "actual knowledge of falsity," Heit v. Weitzen, 402 F.2d 909, 914 (2d Cir. 1968), cert. denied 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), or "recklessness equivalent to wilful fraud," S. E. C. v. Texas Gulf Sulphur, *supra*, 401 F.2d at 888. The decisions made by defendants regarding the registration statement and prospectus in issue were made in good faith and without intent to deceive.

9. Defendants are not entitled to reasonable attorneys' fees, having failed to demonstrate that this suit was brought frivolously and in bad faith. See Can-Am Petroleum Company v. Beck, *supra*; Johns Hopkins University v. Hutton, *supra*; Katz v. Delka Research Corp., *supra*.

Defendants may submit a judgment consonant with the opinion herein.